ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07-40009-JAR |
| | ) |
| LENNY HORTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Lenny Horton's Motion to Suppress Statements (Doc. 15). Defendant moves to suppress statements he made to two different law enforcement agents on December 18, 2006. A hearing on defendant's motion was held on May 21, 2007, at which time the Court took the motion to suppress under advisement. After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule. For the reasons stated below, the Court grants in part and denies in part defendant's motion to suppress.

**I.  Factual Background**

On December 18, 2006 at approximately 11:09 a.m., Trooper Kenneth Woods received a disturbance call for the 6800 block of Kaw Drive in Kansas City, Kansas, located near K-32 and Kansas Avenue. The call reported that a stolen tractor-trailer was parked between a gas station and the Knight Transportation ("Knight") terminal, in a gravel parking lot. Trooper Woods was in his patrol car close to that location, so he responded to the call.

When Trooper Woods arrived on the scene, he observed a tractor-trailer backed up to a

fence. One individual was outside of the truck and another individual appeared to be exiting the cab of the truck when Trooper Woods arrived. The individual getting out of the truck identified himself as Joe Thomas.[1] He told Trooper Woods that he was a safety director for Knight and that he also was a patrol sergeant for the Kansas City, Missouri police. Thomas told Trooper Woods that the trailer belonged to Knight and that it had been stolen in Texas and tracked by satellite to this location. Thomas further informed Trooper Woods that the driver had been given a load, but that he was not one of Knight's drivers and that he did not have a driver's license.

At this point, Trooper Woods asked the driver to step out of the truck. The driver informed Trooper Woods that he did not have identification and Trooper Woods then patted him down. The driver identified himself as defendant Lenny Horton and stated that he was leasing the truck. Defendant advised Trooper Woods that he was heading home to Colorado from Kansas City. Defendant further advised that he had been a "driver" for twelve years and that he was now leased to Schneider, a different trucking company. Trooper Woods noticed that there were Schneider decals on the truck.

Trooper Woods guided defendant over to the front of his patrol car and told him that he needed defendant to "be totally honest with me." He said he was not accusing defendant of anything, but that if he lied to him, it could result in a felony obstruction charge. Trooper Woods then stated that he just needed defendant's name, date of birth, and his story of what happened with the truck. Defendant provided Trooper Woods with his full name, date of birth, social security number, address, height and weight. He stated that he used to have a Colorado driver's license that had been suspended, but that the suspension was no longer in place. Defendant told

---

[1] At the evidentiary hearing, Trooper Woods identified the other individual as Jimmy Garrett and indicated that he worked for Knight. There is no other information in the record about this individual.

2

Trooper Woods that he picked up a load in El Paso, Texas and was to drop off the trailer in Kansas City. When Trooper Woods asked him what was in the load, defendant replied that he was not sure.

Then, at approximately 11:17 a.m., Trooper Woods placed defendant in handcuffs and told him that he was not under arrest, but that he was doing so for his own safety. Immediately after placing defendant in handcuffs, Trooper Woods asked, "How much dope's in the trailer?" Defendant responded, "I'm not sure." Trooper Woods then asked, "You're not sure? But there's some in there?" Defendant responded, "Probably so."

Trooper Woods asked Thomas to watch defendant while he procured his drug detection dog, Rock, from the patrol car.[2] Trooper Woods asked defendant if the drugs were "in the truck or in the back?" Defendant replied, "In the back." Trooper Woods deployed Rock at the rear of the trailer and Rock exhibited a positive indication for narcotics near the tractor. Rock alerted by standing on his hind legs and sniffing and scratching on the passenger side door of the cab. After searching both the trailer and the tractor, Trooper Woods uncovered multiple duffel bags containing marijuana.

At approximately 11:21 a.m., Trooper Woods advised defendant of his rights under *Miranda* to be silent and to counsel. After reading defendant these rights from a standard card, Trooper Woods asked, "Do you understand that?" Defendant's reply is inaudible on the videotape, but there is a pause, followed by Trooper Woods saying "Okay," and proceeding to ask defendant whether someone else gave him the trailer. Defendant advised that he had picked

---

[2]Trooper Woods testified that he asked Thomas for his law enforcement credentials and that Thomas provided him with a Kansas City, Missouri business card and identification card, and with a business card from Knight.

the trailer up in El Paso. When asked if someone was supposed to pick up the trailer, defendant responded, "yeah." When asked when, defendant responded that he did not know. At approximately 11:29 a.m., defendant agreed to cooperate and again stated that he was not supposed to call anybody but was to simply drop off the tractor trailer. Trooper Woods asked Thomas whether "they" had made a report on the trailer being stolen, and Thomas replied that it had been reported stolen.

At approximately 11:43 a.m., another Trooper transported defendant to the Kansas Highway Patrol Troop A Headquarters. Later, Trooper B.K. Smith, assigned to the DEA task force, interviewed defendant. Trooper Smith readvised defendant of his *Miranda* rights at approximately 11:58 a.m. and defendant agreed to cooperate with investigators. Trooper Smith testified that defendant did not hesitate in waiving his rights—he never asked for an attorney nor stated that he did not wish to talk.

## II. Discussion

Defendant moves to suppress all of the statements he made to law enforcement officers on December 18, 2006 under *Miranda v. Arizona.*[3] The government maintains that none of the statements made by defendant should be properly suppressed. The Court will address what can essentially be deemed two types of inculpatory statements by this defendant: (1) statements made prior to Trooper Woods' *Miranda* warning; and (2) statements made to Trooper Woods and later to Trooper Smith after each, respectively, read defendant his *Miranda* rights.

A law enforcement officer's "failure to administer *Miranda* warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and the confession is inadmissible with no

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

need for the 'time consuming and difficult enquiry into voluntariness.'"[4]  For the *Miranda* safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet the legal definition of 'interrogation.'"[5]  The government bears the burden of showing that these rights were waived and the voluntariness of the statements.[6]

A person is in "custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest.[7]  The relevant inquiry for determining whether an individual is in "custody" is whether a reasonable person in that position would "believe [his] freedom of action had been curtailed to a 'degree associated with formal arrest.'"[8]  "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive."[9]  When making this determination, several factors should be taken into account, such as: (1) whether the suspect is made aware he is free to refrain from answering questions and may end the interview; (2) the nature of the questioning; and (3) whether the interview was conducted in a "police dominated" atmosphere.[10]

### A. Pre-*Miranda* Statements to Trooper Woods

---

[4]*United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *United States v. Patane*, 542 U.S. 630, 646 (2004) (Souter, J., dissenting)), *cert. denied*, 127 S. Ct. 1343 (2007).

[5]*United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[6]*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality).

[7]*See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

[8]*United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993), *cert. denied*, 515 U.S. 1168 (1995) (quoting *Beheler*, 463 U.S. at 1125; *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

[9]*Griffin*, 7 F.3d at 1518.

[10]*Id.* 1518–19.

5

The government argues first that the statements made by defendant to Trooper Woods prior to being advised of his rights under *Miranda* were merely responses to "on the scene questioning," and thus, should not be suppressed.  The government points the Court to the following language in *Miranda*:

> When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affe citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.[11]

But this scenario does not apply to this defendant.  Here, the defendant was handcuffed prior to making his initial inculpatory statements.  The on-the-scene questioning language of *Miranda* clearly refers to the questioning of persons "*not under restraint.*"  The Court finds that the questions asked of defendant by Trooper Woods did not constitute the process of generally questioning citizens about a crime.

The government next contends that despite the use of handcuffs, Trooper Woods advised defendant that he was not under arrest and that he was using the handcuffs for his own safety. The government suggests that this fact rendered *Miranda* warnings unnecessary.  Specifically, the government states that "[t]he demeanor of both the Trooper and the defendant indicate that there was none of the coercion of the police-dominated stationhouse interrogation here operating on the defendant."[12]

It is not necessary for a person to be arrested in order to be "in custody" for the purposes

---

[11]*Miranda*, 384 U.S. at 477–78.

[12](Doc. 17 at 7.)

of *Miranda*.[13]  The Court need only determine whether defendant believed that his freedom was curtailed "to a degree associated with formal arrest."  Here, Trooper Woods did not make defendant aware that he was free to refrain from answering his questions.  Prior to defendant making his first inculpatory statements, Trooper Woods told defendant that he needed to be honest with him, or face a "felony obstruction charge."  Trooper Woods then placed defendant in handcuffs.  A reasonable person in this defendant's position would not have perceived that he was free to leave or that he could refuse to answer Trooper Woods' questions.  The Court finds that these facts weigh heavily toward a finding that defendant was "in custody."  Thus, the *Miranda* presumption of compulsion applies and these statements should be excluded from evidence at trial in the government's case-in-chief.  Prior to asking defendant questions, Trooper Woods should have apprised him of his right to remain silent and to counsel.  Defendant's motion to suppress is granted with regard to defendant's responses to Trooper Woods' questions prior to administering the *Miranda* warning.

### B. Post-*Miranda* Statements to Trooper Woods and Trooper Smith

While defendant's statements made prior to receiving a *Miranda* warning must be suppressed, "it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well."[14]  As described above, Trooper Woods' failure to administer a *Miranda* warning to defendant in the first instance only means that the Court

---

[13] While the government does not appear to argue that there was no interrogation, the facts make clear that all of defendant's statements were responsive to questions by Trooper Woods and were not statements volunteered by him.  *See United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (explaining that interrogation includes questioning).

[14] *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1343 (2007).

presumes "that the privilege against compulsory self-incrimination has not been intelligently exercised."[15]  In *Elstad*, the Supreme Court identified the "vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case."[16]  Accordingly, the Court held:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.[17]

Under these circumstances, the Court proceeds to determine if the later statements were made knowingly and voluntarily.[18]

Defendant argues that the Court must suppress defendant's statements made subsequent to the *Miranda* warnings under the more recent case of *Missouri v. Seibert*.[19]  In that case, the Supreme Court considered whether the two-step process of questioning technique employed by

---

[15] *Elstad*, 470 U.S. at 310.

[16] *Id.* at 312.

[17] *Id.* at 314.

[18] *Id.* at 318.

[19] 542 U.S. 600 (2004).

law enforcement was a deliberate violation of *Miranda*. The officer in that case initially questioned the defendant without providing *Miranda* warnings and then, after obtaining a confession, resumed questioning and led the defendant through the same ground covered in the initial confession.[20] There was evidence in that case that the technique was a "police strategy adapted to undermine the *Miranda* warnings."[21]

The Court held that the statements obtained through the two-step technique were inadmissible, but there was no opinion in *Seibert* that received the votes of a majority of Justices. The plurality, joined by four Justices, held that the question to address when this two-step technique is used "is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."[22] The plurality then identified five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object":

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.[23]

Justice Kennedy concurred in the judgment in *Seibert* on narrower grounds: "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before

---

[20]*Id.* at 605.

[21]*Id.* at 616.

[22]*Id.* at 611–12.

[23]*Id.* at 615. The Court indicated that these facts are relevant based on the contrast between *Elstad* and *Seibert*. *Id.*

9

the postwarning statement is made."[24]  Examples of curative measures include a substantial break in time and circumstances between the initial statement and the *Miranda* warning, and an additional warning that explains how it is likely that the earlier statements would be inadmissible.[25]

Due to the lack of a single rationale in support of the result in *Seibert*, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."[26]  But the *Marks* rule does not apply "when the various opinions supporting the Court's decision are mutually exclusive."[27]  In *United States v. Carrizales-Toldeo*, the Tenth Circuit declined to determine which opinion in *Seibert* constitutes the holding of the case, and instead found that the defendants statements were inadmissible under both tests set forth by the plurality and Justice Kennedy.[28]

Like the Tenth Circuit in *Carrizales-Toldeo*, this Court finds that under either analysis in *Seibert*, the *Miranda* warnings by both Trooper Woods and Trooper Smith were effective enough to present this defendant with a choice about whether to remain silent or not.  First the Court addresses the plurality.  Unlike in *Seibert*, the initial questioning by Trooper Woods was

---

[24]*Id.* at 622 (Kennedy, J., concurring).

[25]*Id.*

[26]*Marks v. United States*, 430 U.S. 188, 193 (1977).

[27]*United States v. Carrizales-Toldeo*, 454 F.3d 1142, 1150 (10th Cir. 2006).  Most other circuits to consider this issue have determined that the holding in *Seibert* is found in Justice Kennedy's concurrence, as it is on the narrowest grounds.  *See United States v. Hernandez*, 200 Fed. App'x 283, 286 n.1 (5th Cir. 2006) (collecting cases from the Third, Fourth, Fifth, Seventh, Eighth, and Ninth Circuits).

[28]*Id.* at 1151.

not "systematic, exhaustive, and managed with psychological skill."[29] After placing defendant in handcuffs, Trooper Woods asked, "How much dope's in the trailer?" Defendant responded, "I'm not sure." Trooper Woods then asked, "You're not sure? But there's some in there?" Defendant responded, "Probably so." Then, while he allowed Rock to sniff the tractor-trailer for drugs, Trooper Woods asked defendant if the drugs were "in the truck or in the back?" Defendant replied, "In the back." These questions were short and appear to be made off-the-cuff.

Trooper Woods' subsequent questions to defendant do not appear to overlap with the content of his initial questions. While the initial questions surround the location of the drugs, Trooper Woods' later questions surround the source of the drugs by asking where he picked up the truck and what he was supposed to do with it when he reached Kansas City. The exact content of defendant's later statements to Trooper Smith is not included in the record, so the Court is unable to determine the overlapping nature of those statements with his initial statements.

With regard to the third and fourth factors in the *Seibert* plurality, while there was some police continuity between the first and second statements to Trooper Woods, there was no evidence of such between the first statements to Trooper Woods and the later warned statements to Trooper Smith. There is no evidence to suggest that the two troopers had a "coordinated and continuing interrogation" like in *Seibert*. Also, the fact that Rock had positively alerted to drugs before Trooper Woods *Mirandized* defendant should have signaled a "new and distinct experience." Finally, under the last factor in the *Seibert* plurality's analysis, there is no evidence that the answers given in the initial statements to Trooper Woods were referenced in the later

---

[29]*See id.* at 616.

interrogations with either Trooper Woods or Trooper Smith.  Under the *Seibert* plurality's view, defendant's statements would be admissible.

Under Justice Kennedy's view, the statements are also admissible.  There is no suggestion, nor any evidence in the record, that Trooper Woods intentionally delayed *Mirandizing* defendant until after he made the initial unwarned statements.  Given the lack of evidence of this being a deliberate "two step interrogation," the Court must only determine if the later statements were voluntary.

In determining whether a statement is voluntary, the Tenth Circuit considers the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment.[30] "The determination of voluntariness is based on the totality-of-the-circumstances; none of the single factors listed above is determinative."[31]  After reviewing all of the factors, the Court concludes that defendant's statements were voluntary.  Defendant was thirty-four years old at the time of the search.  There is no evidence that defendant's intelligence or education limited his ability to voluntarily made these statements.  The length of the detention was approximately fifteen minutes between the time Trooper Woods arrived and when he read defendant his *Miranda* rights.  The entire encounter involving Trooper Woods lasted for approximately forty-five minutes before defendant was transported to Headquarters to be interviewed by Trooper Smith.  As already stated, the length and nature of the questioning was brief and limited to the

---

[30]*United States v. Glover*, 104 F.3d 1570, 1579 (1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[31]*Id.* (citing *Schneckloth*, 412 U.S. at 226).

question of whether there were drugs in the car and where.  There is no evidence that defendant was subjected to any form of physical punishment.  Trooper Woods, and later Trooper Smith, advised defendant of his *Miranda* rights and the videotape of the encounter with Trooper Woods reveals defendant was calm and does not appear intimidated in such a way that could render the statements involuntary.  Based on the totality of these circumstances, the Court finds that defendant's statements made subsequent to both *Miranda* warnings were voluntary, despite the earlier unwarned statements.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Suppress Statements (Doc. 15) is **granted in part and denied in part**.  The motion is granted as to defendant's pre-*Miranda* statements to Trooper Woods and the motion is denied as to all statements made subsequent to the *Miranda* warnings.

**IT IS SO ORDERED**.

Dated this  14th   day of June 2007.

        S/ Julie A. Robinson
        Julie A. Robinson
        United States District Judge